**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Raohl HURSH, Defendant–Appellant.**

**No. 99–50504.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 2000.

Filed July 6, 2000

Mark A. Chambers, Escondido, California, for the defendant-appellant.

Cynthia Bashant (Argued), Assistant United States Attorney, and Renee M. Bunker (On the Briefs), Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: WALLACE, TROTT, and GOULD, Circuit Judges.

TROTT, Circuit Judge:

Raohl D. Hursh ("Hursh") appeals his jury convictions and sentence for importation of marijuana in violation of 21 U.S.C. §§ 952 and 960, and for possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we AFFIRM Hursh's convictions and sentence.

# I

## FACTUAL BACKGROUND

On January 15, 1999, at approximately 7:00 p.m., Hursh, who was the driver and sole occupant of a 1982 Chevrolet Camaro, attempted to enter the United States from Mexico at the port of entry in Calexico, California. At the port of entry, Hursh was first approached by Immigration and Naturalization Service ("INS") Inspector Ruben Vela. Inspector Vela questioned Hursh about the purpose of his trip to Mexico, to which he responded "I went down there to look around." Vela testified that, during questioning, Hursh seemed nervous, he did not maintain eye contact, and he was looking around at the other vehicles, the street, and the secondary lot. Vela therefore decided to inspect the situation further and proceeded to walk around the vehicle. As he did so, Vela peered into the hatchback and noticed that there were no personal belongings or effects in the car. At that point, Vela referred Hursh to secondary inspection.

At the secondary inspection lot, Hursh was questioned by INS Inspector Joseph Rodriguez, who, like Vela, asked Hursh about the purpose of his trip to Mexico. Inspector Rodriguez testified that Hursh told him (1) that he was delivering a vehicle to an auto dealer in Calexico, and (2) "that he was just down there to visit a couple cocktail bars." According to Rodriguez, Hursh avoided eye contact as he answered this question. Rodriguez then requested identification, and Hursh provided his California driver's license. Rodriguez said that Hursh's hands were shaking as he handed over his license, which led him to believe that Hursh was nervous.

At that point, Rodriguez asked Hursh to turn off the car, step out of the vehicle, open up the hood and trunk, and stand in front of the car. Initially, Hursh objected to turning off the car, explaining that the battery was low; however, when Rodriguez insisted he turn off the vehicle "for officer safety," Hursh complied. Hursh then exited the vehicle, opened the hood and trunk, and stood in front of the car. Rodriguez testified that as Hursh stood in front of the car, he was "quite nervous," evidenced by the fact that he was "tapping his foot on the floor, just being fidgety, [and] moving around."

Rodriguez then summoned a drug dog to inspect the exterior and interior of Hursh's vehicle. As the dog searched the car, Hursh pulled out his wallet and showed

Rodriguez a picture of his wife—an immigration inspector in Los Angeles—in her uniform. At trial, Rodriguez testified that he believed Hursh showed him this picture in order to create some sort of "diversion." Because the drug dog did not alert to any particular part of the vehicle, Rodriguez proceeded to inspect the car himself. In so doing, Rodriguez tapped the gas tank and noticed that it sounded solid, which, in his experience, meant that there was something inside.

Shortly thereafter, Rodriguez escorted Hursh into the security office for a routine pat down, after which Rodriguez returned to the vehicle to continue his inspection. In particular, Rodriguez inspected the gas tank with a fiber optic tool that allowed him to view the inside of the tank. Rodriguez testified that, using this tool, he was able to see "colored packages" inside the gas tank, which he concluded were some sort of controlled substance. At that point, the vehicle, which would not start, was towed to a nearby service station to have the gas tank removed. When the mechanics removed the gas tank, they discovered about two and one-half gallons of gasoline as well as thirty-six packages of marijuana (approximately 59.3 pounds) inside.

Subsequently, United States Customs Special Agent Jay Pina was assigned to the case. At approximately 11:23 p.m. on January 15, 1999, Pina arrested Hursh. Pina testified that at the time of arrest, Hursh seemed very tense, as he was clenching his fists, breathing extremely heavily, and staring at the ceiling. Although he was advised of his *Miranda* rights, Hursh waived these rights and agreed to speak with Pina. According to Pina, Hursh initially told him that he was in Mexico because he was delivering the 1982 Camaro to a car dealer in Calexico for someone named "Fernando." However, Pina testified, Hursh then changed his story saying that Fernando had driven the Camaro, while Hursh followed in another vehicle. Hursh then proceeded to tell Pina the rest of his version of the story to which he also testified at trial.

According to Hursh, once arriving in Calexico, he parked the car he was driving, Fernando paid him $60 for his services, and he got into the Camaro with Fernando. It was approximately 3:00 p.m. at this point, and the two men decided to go to some bars in Mexicali. When they arrived in Mexicali, Fernando dropped Hursh off at a bar, parked the Camaro, and joined Hursh about ten to fifteen minutes later. After having a couple of beers, Fernando left the bar for about twenty minutes. When Fernando returned, the two men decided to go to another bar, where they had a couple of more beers before Fernando once again left.

Hursh testified that, after Fernando left the bar the second time, he did not see him again until about 6:30 that night. Hursh explained that he was window shopping when Fernando drove down the street in the Camaro yelling "Raohl, come on. Let's go." At that point, Hursh got into the car with Fernando, and they headed toward the border. There were several vehicles at the border, so Hursh and Fernando were in line for approximately twenty-five minutes before reaching primary inspection. As they waited in line, Fernando told Hursh that he had to walk across the border and, thus, asked Hursh if he would drive the car through the port of entry. Hursh agreed, Fernando exited the car, and Hursh climbed into the driver's seat. Before Fernando got out of the car, however, he allegedly instructed Hursh not to turn off the car because it "won't start again." Soon thereafter, Hursh entered the primary inspection area, and the events discussed above unfolded.

Pina testified that after listening to Hursh's version of the story, he questioned him further. To begin, he asked Hursh to approximate the amount of time that he and Fernando were separated while in Mexicali. Hursh told Pina that Fernando was gone for a total of about one hour.

Pina then suggested to Hursh that Fernando could not possibly have retrofitted the gas tank and hidden the marijuana in such a short amount of time. In response, Hursh insisted that such a task could be accomplished in an hour, and then he proceeded to explain the process to Pina in "extreme detail." At the end of this explanation, Hursh said "I'm also a mechanic. I know these things."

## II

## PROCEDURAL BACKGROUND

On January 27, 1999, a federal grand jury indicted Hursh for importation of marijuana pursuant to 21 U.S.C. §§ 952 and 960 and for possession of marijuana with intent to distribute pursuant to 21 U.S.C. § 841(a)(1). Both Hursh and the government filed several pre-trial motions, only one of which—the government's motion to admit impeachment evidence under Federal Rule of Evidence ("FRE") 609—is relevant to this appeal. On April 19, 1999, the district court reserved ruling on that motion until the court had an opportunity to hear Hursh's testimony at trial.

The trial began on April 20, 1999, and lasted for two days. As mentioned in the previous section, Vela, Rodriguez, and Pina, among others, testified for the government, and Hursh opted to take the stand and testify on his own behalf. In short, Hursh's defense was that he had been "tricked" by Fernando, and that he knew nothing about the marijuana in the gas tank of the Camaro. After hearing Hursh's testimony, the district judge determined that the evidence regarding Hursh's prior felony conviction was more probative than prejudicial and, therefore, granted the government's motion to admit the impeachment evidence under FRE 609.

On the morning of April 21, 1999, which was after the close of evidence, but before closing arguments, one of the jurors—Earnest Post ("Juror Post")—sent a note to the judge, which said:

I move to ask the judge a question in private about the law. I would like to do it in private because I believe if counsel hears my question, it might illuminate my position. I want to remain anonymous to both sides as to my position. My question is about only the charges and the reasons given by the defense. Thank you.

After receiving the note, Judge Keep met with both parties' attorneys in chambers and told them about the note. At that time, Hursh's attorney objected to Juror Post remaining on the panel and asked that he be replaced by an alternate. Hursh's attorney explained to Judge Keep that "[i]t appears that he's already decided—I mean, just from the note, I—that he's already decided—if he's already asking questions about the law before he's even been instructed on the law...." The district court overruled the objection, decided to keep Juror Post on the panel, and denied Hursh's motion for a mistrial. In addition, the court sent the following note back to Juror Post:

It would be improper for me to meet with you alone. Counsel are going to make their final comments to you now, and then I will instruct the panel on the law. Once you go into the jury room and go over the instructions, if you still have a question about the law, you may write a note signed by your presiding juror, yourself, or any member of the jury.

Later that afternoon, the attorneys presented their closing arguments, the court instructed the jury, and the jury began deliberating. Before the members of the jury were dismissed that day, they were instructed not to discuss any aspect of the case unless all twelve jurors were present.

The next morning at 9:00 a.m., the jurors were summoned and brought to the jury room by law clerks/bailiffs Ryan Goldstein and Todd Jackson. The bailiffs counted the jurors as they entered the jury room and realized that one juror was

missing. The bailiffs checked the hallway, but they did not find the twelfth juror. Approximately ninety seconds to three minutes passed before Goldstein returned to the jury room and re-admonished the jury not to discuss the case. One of the jurors told Goldstein that nobody had discussed the case, but that they were reading over their notes and looking at the exhibits on their own. Goldstein instructed them to stop reviewing any materials related to the case until all twelve jurors were present.

Goldstein then left the room and joined Jackson, who was still trying to locate the missing juror. Within five minutes, the twelfth juror was located and escorted to the jury room. According to the court reporter's notations, the eleven jurors entered the jury room at 9:05 a.m., while the twelfth juror arrived at 9:14 a.m. After deliberating for about three hours, the jurors returned a unanimous guilty verdict on both counts of the indictment. Hursh then made a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which the district court denied.

Prior to his sentencing hearing, Hursh moved for a new trial based on (1) the district court's decision to admit the FRE 609 evidence, and (2) the fact that the verdict was not unanimous in light of the twelfth juror's late arrival to the deliberations. In addition, Hursh moved for a downward adjustment under U.S.S.G. § 3B1.2(a) because, he contended, he was a minimal participant in the crime for which he was convicted. At the sentencing hearing on July 12, 1999, the district court denied both of these motions. The court then sentenced Hursh to a prison term of forty-six months on each count, to run concurrently, with three years of supervised release. Hursh appeals.

## III

### DISCUSSION

Hursh argues that we should reverse his convictions for the following reasons: (1) there was insufficient evidence to support the verdict; (2) the district court abused its discretion in granting the government's motion to admit impeachment evidence under FRE 609; (3) the district court erred by failing to excuse Juror Post from the panel; and (4) the verdict was not unanimous as required by Federal Rule of Criminal Procedure 31(a) because one of the jurors arrived late to the deliberations. Hursh also challenges his sentence, contending that the district court erred in denying his motion for a downward adjustment based on his role as a minimal participant. We conclude that all of Hursh's contentions are without merit and, therefore, we affirm.

### A. Sufficiency of the Evidence

■ We review de novo the district court's denial of a motion for judgment of acquittal based upon insufficient evidence to sustain a conviction. *United States v. Hernandez*, 105 F.3d 1330, 1332 (9th Cir. 1997). In reviewing a challenge to the sufficiency of the evidence, we must ask whether, viewing "the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir.1996) (internal quotation marks omitted).

■ Hursh asserts that there was insufficient evidence to support the verdict because the government failed to prove that he had knowledge of the marijuana in the gas tank. Hursh is wrong. To begin, it is well-settled that "[m]ere possession of a substantial quantity of narcotics is sufficient evidence to support a finding that a defendant knowingly possessed the narcotics." *United States v. Collins*, 764 F.2d 647, 652 (9th Cir.1985). Here, Hursh was the driver and sole occupant of a car whose gas tank contained 59.3 pounds of marijuana, which is a "substantial quantity of narcotics." As such, the jury could properly infer that Hursh knew about the

drugs. *See United States v. Davila–Escovedo*, 36 F.3d 840, 843 (9th Cir.1994).

Moreover, the government presented other evidence that Hursh knew about the marijuana in the gas tank. First, Inspectors Vela and Rodriguez testified that Hursh seemed very nervous during questioning. Second, there was evidence that Hursh changed his story about the purpose of his trip to Mexico. Third, Rodriquez testified that Hursh refused to turn off the car and attempted to create a diversion by showing him a picture of his wife. Finally, Agent Pina testified that Hursh explained the process of retrofitting a gas tank in great detail. Based on all of this evidence, a rational juror could have concluded that the government established beyond a reasonable doubt that Hursh had knowledge of the marijuana in the gas tank.

### B. FRE 609 Impeachment Evidence

■ Next, Hursh argues that we should reverse his convictions because the district court erred in admitting evidence of his prior felony conviction for impeachment purposes. We review the district court's decision to admit impeachment evidence for an abuse of discretion. *United States v. Bensimon*, 172 F.3d 1121, 1125 (9th Cir.1999).

■ Generally, FRE 609 provides that evidence of prior felony convictions is admissible for purposes of attacking a witness's credibility if the prejudicial effect of the evidence is outweighed by its probative value. *See* Fed.R.Evid. 609. In *United States v. Browne*, 829 F.2d 760 (9th Cir. 1987), we outlined five factors that a district court should consider in balancing the probative value of evidence of a defendant's prior convictions against that evidence's prejudicial effect. *Id.* at 762–63. These factors are: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of defendant's

testimony; and (5) the centrality of defendant's credibility. *Id.*

■ A review of the record in this case reveals that the district court heard Hursh's direct examination testimony, properly considered and weighed all of the *Browne* factors, and then granted the government's motion to admit evidence of Hursh's prior felony conviction. Furthermore, the evidence of Hursh's prior felony conviction was "sanitized," meaning the nature of the felony for which Hursh was convicted—possession of heroin—was not discussed. Thus, we conclude that the district court did not abuse its discretion in admitting this evidence.

### C. District Court's Failure to Excuse Juror Post

■ Hursh's third contention is that his conviction should be reversed because the district court erred by failing to excuse Juror Post from the panel. We review "for manifest error a court's findings regarding juror impartiality." *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks omitted). Hursh bears the burden of showing that Post "was actually biased" against him, "and that the district court abused its discretion or committed manifest error when it failed to excuse [Juror Post] for cause." *See id.* (internal quotation marks omitted). Hursh fails to meet this burden.

■ Hursh maintains that Juror Post should have been removed from the panel because, as evidenced by the note sent to Judge Keep, he had formed an opinion about the case prematurely. It is true that "[t]he theory of the law is that a juror who has formed an opinion cannot be impartial." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (internal quotation marks omitted). The Supreme Court has explained, however, that

scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the

merits of the case.... To hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a ... juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 722–23.

Here, Juror Post's note simply stated that he believed if counsel heard his question, "it might illuminate [his] position." Even if we assume arguendo that this statement indicates Juror Post had formed an opinion, that does not necessarily mean he was actually biased against Hursh. Indeed, if Juror Post could "lay aside his impression or opinion and render a verdict based on the evidence presented in court," *id.* at 723, 81 S.Ct. 1639, then he was impartial.

The only evidence that Hursh has presented to prove that Juror Post was biased is the note sent to Judge Keep. As the district court concluded, however, there is nothing in the note to suggest that Juror Post had already made up his mind, that he would not deliberate, or that he would not base his verdict on the evidence. Moreover, Post wrote the note *after* the close of evidence; therefore, it is likely that any opinion he might have formed by the time he wrote the note was based on the evidence presented in court. Accordingly, we hold that Hursh has failed to sustain his burden of proving that Juror Post was actually biased against him.

## D. Unanimous Verdict

■■■■ Hursh's final claim regarding his convictions is that the district court erred in denying his motion for a new trial on the ground that the verdict was not unanimous as required by Federal Rule of Criminal Procedure 31(a) ("Rule 31(a)").[1] We review the district court's finding that a jury's verdict is unanimous under the clearly erroneous standard, *United States v. McClintock,* 748 F.2d 1278, 1292 (9th Cir.1984), and the denial of a motion for a new trial for an abuse of discretion, *United States v. Peterson,* 140 F.3d 819, 821 (9th Cir.1998).

■■■■ Hursh bases his argument that the verdict was not unanimous on the fact that one of the jurors arrived late to deliberations, leaving the other eleven jurors in the jury room unsupervised for approximately ten minutes. During ninety seconds to three minutes of this time, the jurors silently read over their notes and examined the exhibits, which, according to Hursh, amounted to "deliberations." Hursh contends that because only eleven jurors participated in these "deliberations," the verdict was not unanimous and a new trial should have been granted. We disagree.

The term "deliberations" is not defined by statute or case law; therefore, we must look to the dictionary for the ordinary, common meaning of this word. *Black's Law Dictionary* defines "deliberation" as:

> The act of carefully considering issues and options before making a decision or taking some action; esp., the process by which a jury reaches verdict, *as by analyzing, discussing, and weighing the evidence.*

*Black's Law Dictionary* 438–39 (7th ed.1999) (emphasis added). Here, all that the eleven jurors did was silently review their notes and examine the exhibits. They did not discuss the case with their fellow jurors. We conclude that such conduct does not involve analyzing, discussing, or weighing the evidence and, therefore, does not rise to the level of "deliberations." *Cf. Allen v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896) ("The very object of the jury system is to secure unanimity by a comparison of

---

1. Rule 31(a) provides that "The verdict shall be unanimous. It shall be returned by the jury to the judge in open court." Fed. R.Crim.P. 31(a).

views, and by arguments among the jurors themselves."). Accordingly, we hold that the district court did not clearly err in finding that the verdict was unanimous for purposes of Rule 31(a), and we affirm the district court's denial of Hursh's motion for a new trial.

### E. Sentencing

 Finally, Hursh challenges his sentence on the ground that the district court erred in denying his motion for a downward adjustment pursuant to section 3B1.2 of the United States Sentencing Guidelines ("U.S.S.G.").[2] We review the district court's finding that the defendant was not a minimal or minor participant for purposes of U.S.S.G. § 3B1.2 for clear error. *United States v. Ruelas,* 106 F.3d 1416, 1419 (9th Cir.1997).

 There is no evidence that Hursh's role in the crimes for which he was convicted was minimal or minor. Rather, Hursh was the driver and sole occupant of a vehicle in which a substantial amount of marijuana was hidden, and the evidence proved that Hursh knew the drugs were in the gas tank. Hence, the district court properly denied Hursh's motion for a downward adjustment. *See United States v. Davis,* 36 F.3d 1424, 1436 (9th Cir.1994) ("[T]he fact that a defendant acted as a drug courier does not [necessarily] mean his role was minimal or minor."); *United States v. Rigby,* 896 F.2d 392, 393–94 (9th Cir.1990) (defendant not a minor participant when he was sole occupant of a car in which 173 grams of methamphetamine and a loaded handgun were found).

AFFIRMED.

---

2. U.S.S.G. § 3B1.2 provides:
 Based on the defendant's role in the offense, decrease the offense level as follows:
 (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

 In cases falling between (a) and (b), decrease by 3 levels.