UNITED STATES of America,
Plaintiff–Appellee,

v.

Roberto MARTINEZ–MARTINEZ,
Defendant–Appellant.

No. 03–50230.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 30, 2004.

Filed May 13, 2004.

sandra P. Serano, Assistant United States Attorneys (on brief), Roger W. Haines, Jr., Assistant U.S. Attorney (at oral argument and on petition for rehearing), United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before: CYNTHIA HOLCOMB HALL, STEPHEN S. TROTT, and CONSUELO M. CALLAHAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Senior Circuit Judge:

Appellant Roberto Martinez–Martinez ("Martinez") appeals his conviction and 51-month sentence for attempted illegal re-entry into the United States in violation of 8 U.S.C. § 1326. At trial, Martinez argued that he did not possess the specific intent required to convict under § 1326 for attempting to enter, because the combined effect of heroin, methamphetamine, and Rohypnol (commonly known as "ruffies", or the "date rape drug") rendered him "blacked out," and therefore not in control of his conscious mind. On appeal, Martinez raises several arguments, though he primarily focuses his attention on claims that the district court seated a biased juror, and impermissibly allowed the government to delay indicting him after his arrest by improperly tolling the Speedy Trial Act.

We exercise jurisdiction over Martinez's appeal pursuant to 28 U.S.C. § 1291. As we find none of Martinez's arguments availing, we now affirm the proceedings before the district court below in their entirety.

## I.

### BACKGROUND

On May 14, 2002, Martinez, a native and citizen of Mexico who had been deported

Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney, Roger W. Haines, Jr., Shanna L. Doherty, David P. Curnow, Stephen R. Cook, Ales-

from the United States on September 22, 1998, was arrested attempting to enter the United States illegally. Martinez was a drug addict who regularly used heroin, crystal methamphetamine, and Rohypnol.[1] On May 14, Martinez awoke at approximately 6:00 A.M. and engaged in his daily drug regimen, which included smoking a quarter gram of methamphetamine, ingesting two or three two-milligram doses of Rohypnol, and intravenously injecting himself with a quarter gram of heroin, as many as three times. He left his house in Tijuana, Mexico, to travel downtown to get medication for his infirm mother.

Around noon, Martinez arrived at the international border at San Ysidro, California. Prior to reaching the border, Martinez was required to stand in line at the border fence, walk fifty yards to the Port of Entry building, and wait in lines which led through metal detectors to the pedestrian inspection booths. Upon arriving at the primary inspection area, Martinez applied for entry to an immigration inspector, who then asked Martinez a series of questions in English. Martinez dishonestly stated that he had been born and attended school in Los Angeles, and that he was going to Chula Vista. Following a computer check, the inspector referred Martinez to secondary inspection, based on his belief that Martinez had falsely asserted to be a United States citizen.

At secondary inspection, Martinez admitted under questioning to having previously been deported from the United States. Neither the primary nor the secondary immigration inspector saw any indication that would give them cause to suspect that Martinez was under the influence of any drugs. Following his admission, Martinez was referred to the Port

Inspection Team. Some time after 3:00 P.M., Martinez was interviewed by Immigration Inspector Gregory Harrison. Harrison spoke to Martinez in Spanish, advising him that he was being placed under arrest, and explaining his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Martinez appeared to understand everything Harrison said to him, and responded appropriately. Harrison then completed a health questionnaire to establish Martinez's physical state. Although Harrison noted that Martinez admitted to being a heroin addict, he also described Martinez as alert and coherent, and able to function in a normal, rational manner. Since Martinez did not appear to be under the influence of any drugs, Harrison deemed him transportable, and ordered him sent to the Metropolitan Correctional Center ("MCC") in downtown San Diego.

Martinez was transferred from San Ysidro to the MCC by an unidentified officer later that night. At the MCC, Martinez was interviewed by a physician's assistant ("P.A.") charged with evaluating Martinez to ensure he was healthy enough to be admitted to the MCC, which would not accept prisoners who were under the influence of drugs. He indicated that he was suffering symptoms of withdrawal, since he had not injected any heroin in at least eleven hours, and generally used it every night. The P.A. administered prescription medication for heroin withdrawal, but did not take any blood or urine samples. Early the next morning, another P.A. received an emergency call to attend to Martinez, who was lying on the floor suffering from leg cramps, a common symptom of heroin withdrawal. The P.A. administered an additional dose of withdrawal medication.

---

1. Rohypnol is the trade name for the sedative hypnotic benzodiazepine, commonly referred to as "ruffies," "roachies," and the "date rape drug." For ease of reference, we shall refer to the drug as "Rohypnol."

Within the next fifteen minutes, Martinez was removed from the MCC, which does not generally treat patients suffering from a severe case of withdrawal.

Having been diagnosed with heroin dependence, Martinez was ordered sent to the Alvarado Parkway Institute ("API") for detoxification. For unexplained reasons, two unidentified immigration officers arrived at MCC and transported Martinez back to San Ysidro. He was then loaded into a van, and taken to API. While at API, a mass was discovered in a chest x-ray, and Martinez was thereafter transferred to Alvarado Hospital for treatment. He remained at Alvarado Hospital until June 5, 2002, in order to receive treatment for a collapsed lung.

Following his release from the hospital, Martinez appeared before District Judge Napoleon Jones, Jr. on June 6, 2002. On July 3, 2002, Martinez was indicted on one count of attempted entry after deportation in violation of 8 U.S.C. § 1326 (2002).

The exchanges between the counsel for the government ("AUSA") and defense counsel between indictment and trial were contentious. On November 26, 2002, Judge Jones ordered the government to produce any records pertaining to Martinez's transportation to, and treatment at the various medical facilities, including MCC, API, and Alvarado Hospital. On December 12, 2002, defense counsel appeared before Judge Jones to protest the "run-around" he received from MCC personnel who were reluctant to turn over any documents without a subpoena. The court ordered the production of the documentation sought by the defense, with the caveat that in camera review would be available for any arguably non-discoverable material. Ultimately, all relevant documentation was produced to the defense, but only after some of it had been rescued from a "shredding pile."

Jury voir dire commenced on January 14, 2003. Defense counsel attempted to probe any antipathy the potential jurors might have to his client's anticipated claim that he could not form the requisite intent to commit the crime because of the effect of illegal drugs. He asked generally whether it would be hard for them to be fair to a person who admittedly abused drugs. He strayed close to impermissibly arguing his case at several moments, but never crossed the line. Finally, defense counsel pointedly explained that "one of the things you can consider" when determining whether the government has proven that Martinez intended to attempt to enter the United States "is whether or not he was under the influence of drugs." He clarified that "if, based on the evidence of drug use, you conclude that the government hasn't proved the intent element beyond a reasonable doubt, you have to find Mr. Martinez not guilty." He asked the venire whether any of them would be uncomfortable with that aspect of their duty as a juror, and several people raised their hand to indicate that they would. Among those so indicating was prospective juror 28, Mr. Rounds. Immediately thereafter, the court intervened and asked "whether or not there is anyone that would be unable to follow the law as I state it to you, other than those individuals that have already so indicated." Mr. Rounds did not respond to the court's question. Counsel for the United States sought to rehabilitate any potentially tainted members of the venire by asking "is there anybody in here who would not be able to put aside their daily experiences for the duration of this trial and apply the facts that you will hear from the witnesses who take the stand to the law that Judge Jones will provide for you at the end of this trial?" No one, including Mr. Rounds, indicated that they would not be able to do so.

Defense counsel moved the court to dismiss six of the jurors who indicated they would be uncomfortable with acquitting Martinez based on the theory to which counsel alluded. The government opposed the motion on the grounds that the members of the venire had been confused by defense counsel's alleged misstatements of the law, and that in any event they were rehabilitated by the questions of government counsel and the court. The court sided with defense counsel as to four of the individuals, who were dismissed for cause. The court believed the remaining two had been rehabilitated. Defense counsel used a peremptory strike on one of those two, but Mr. Rounds was selected to sit on the petit jury.

Martinez's trial commenced on January 14, 2003. The evidence adduced by the prosecution established that Martinez committed the acts which formed the basis of the charge against him, and that Martinez did not appear to be under the influence of any drugs when he was originally detained at the border. The evidence offered by the defense established that the defendant had taken multiple courses of hard drugs prior to attempting to enter the United States, that he had admitted as much to the immigration inspectors during his detention, and that the combination of drugs he had taken could lead to a "blackout" in which the defendant could continue to function, without realizing what he was doing. In addition, the defense provided evidence that Martinez began suffering from pronounced bouts of heroin withdrawal as early as the night (or very early the next morning) he was arrested. Nevertheless, Martinez was adjudged guilty on January 17, 2003. He was sentenced to 51 months' imprisonment, with no downward adjustment for acceptance of responsibility, on May 6, 2003. This appeal followed.

## II.

Martinez raises several arguments in support of his request that we either vacate his conviction, or remand his case to the district court for re-sentencing. He contends that the district court erred by: (1) denying his motion to challenge an ostensibly biased juror for cause; (2) refusing to instruct the jury regarding the issue of a drug-induced blackout; (3) improperly tolling the Speedy Trial Act; (4) declining to dismiss the indictment based on the government's failure to take a blood or urine sample; (5) permitting the government to impeach Martinez with a prior felony conviction; and (6) rejecting Martinez's motion to adjust downward based on his acceptance of responsibility. In addition, Martinez urges the panel to overturn his conviction on the basis of (7) the cumulative effect of errors committed at his trial. We address each of Martinez's arguments in turn.

## A.

Martinez alleges that his Sixth Amendment right to a fair trial was infringed by the seating of an allegedly biased juror, Mr. Rounds. The Sixth Amendment guarantees criminal defendants a verdict by an impartial jury. *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir.2000). Both actual and implied bias may be grounds for reversal, since"[t]he bias or prejudice of even a single juror is enough to violate" the Sixth Amendment guarantee. *Id.* However, as Martinez contends that the juror in his case indicated actual hostility to his theory of defense, we need only consider that juror's actual, and not implied bias.

A defendant who asserts that a juror was actually biased against him bears the burden of demonstrating both the bias itself, and the court's erroneous refusal to strike the juror on the basis of

that bias. *United States v. Hursh*, 217 F.3d 761, 768 (9th Cir.2000). The trial court's findings regarding actual juror bias are reviewed under an extremely deferential standard, and should only be overturned for manifest error or abuse of discretion. *Gonzalez*, 214 F.3d at 1112. At the same time, "[d]oubts regarding bias must be resolved against the juror." *Id.* at 1114.

 Martinez contends that Rounds raising his hand in response to the question of whether anyone was "uncomfortable" with the idea that a person might escape criminal responsibility on the grounds of voluntary intoxication indicates actual bias. The "existence of a state of mind that leads to an inference that [a] person will not act with entire impartiality" constitutes "actual bias" for which a juror must be excused. *Id.* at 1112. There is little question that Rounds' initial response to counsel's query at least supported the inference that he might not be able to act with entire impartiality. Although he did so with a silent hand raise, Rounds echoed the sentiment of his fellow venireperson, who "wasn't going to buy into the drug defense that, because he was on drugs, he was going to be innocent." Several members of the venire made quite clear that they would have a difficult time finding that the intent element of the alleged crime could be negated by a person's voluntary ingestion of illegal drugs. As a preliminary matter, the response of those individuals, including Rounds, suggested a possible bias which might require a for-cause dismissal.

The fact that Rounds raised his hand to indicate discomfort does not end the inquiry. The government contends that Rounds was rehabilitated by his failure to respond to questions posed by the Assistant United States Attorney (AUSA) and the judge. "A juror's initial impressions or initial bias may be irrelevant, at the trial judge's discretion, when that juror commits to lay aside those feelings and reach a verdict based on the evidence presented and the court's instructions." *Image Tech. Svcs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 (9th Cir.1997). In the instant case, Judge Jones interrupted defense counsel's voir dire to inquire "whether or not there [was] anyone that would be unable to follow the law as [he] state[d] it to [them], other than those individuals that have already so indicated." Rounds did not respond. Though the government contends that Rounds' silence indicated a willingness to put aside any misgivings about the proposition advanced by the defense, and essentially "cleared up" any potential source of bias, the judge's qualifying phrase, "other than those individuals who have already so indicated," suggested to Rounds that he need not renew his objection to the proposition described by defense counsel. Given that "[d]oubts regarding bias must be resolved against the juror," *Gonzalez*, 214 F.3d at 1114, we find that Rounds had not withdrawn his earlier "statement" that he was uncomfortable with the law described by defense counsel.

However, a juror may also be rehabilitated by the voir dire of opposing counsel. In this case, the AUSA asked specifically if there were "anybody in here who would not be able to put aside their daily experiences for the duration of this trial and apply the facts that you will hear from the witnesses who take the stand to the law that Judge Jones will provide for you at the end of this trial?" There was no response. In the context of the voir dire, that failure to respond can be construed as a commitment by Rounds to follow the law. His earlier silence in response to defense counsel's question indicated nothing more than a discomfort with the law as it was

explained to him. His silent response to the AUSA's question, on the other hand, specifically committed him to "put aside" his preconceived notions and apply the facts to "the law that Judge Jones will provide." Since a judge is well within his discretion to conclude that a juror has been rehabilitated "when that juror commits to lay aside those feelings and reach a verdict based on the evidence presented and the court's instructions," *Image Tech. Svcs.*, 125 F.3d at 1220, Rounds' silence in response to the AUSA's question indicated a willingness to follow the law.

The trial court's refusal to excuse Rounds may only be overturned if it was an abuse of discretion for the trial court to conclude that Rounds had committed to lay aside any feeling he had regarding Martinez's defense, and to reach a verdict based on the evidence and the instructions. The trial judge determined that, although the juror raised his hand to indicate discomfort with the argument being posited by Martinez's counsel, he was confident based on the juror's silent responses to follow-up questions that the juror was willing to set aside any such discomfort when considering the case. Under our deferential standard of review, that determination is entitled to great weight. We conclude that the trial judge's determination that Rounds had not demonstrated any actual bias did not constitute an abuse of discretion.

### B.

■ Martinez contends that the district court erred by refusing to instruct the jury that if they had a reasonable doubt as to whether or not he was "blacked out" when he attempted to reenter the United States, they must acquit. We review the issue of whether the trial court's instructions adequately presented the defendant's theory of the case de novo. *United States v.*

*Mason*, 902 F.2d 1434, 1438 (9th Cir.1990). While a "defendant is entitled to have the judge instruct the jury on his theory of the defense," "it is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions adequately cover the defense theory." *Id.* at 1438.

■ Martinez admitted to committing the acts underlying the crime of attempted entry after deportation. His theory of defense was that, notwithstanding his commission of the underlying acts, the government could not prove that he intended to commit those acts. Specifically, Martinez claimed that the fact that he was under the influence of drugs rendered him incapable of comprehending the ramifications of his actions. The defense of intoxication, even if that intoxication was voluntary, has been recognized by this circuit as a valid defense to the mens rea of specific intent. *United States v. Echeverry*, 759 F.2d 1451, 1454 (9th Cir.1985). Once the defendant adduces sufficient evidence to raise the issue, "the capacity to form specific intent at the time of the offense becomes an element which, like all other elements of the crime, must be proved by the government beyond a reasonable doubt." *Id.*

■ In support of his theory, Martinez marshaled a fair amount of evidence. He testified that he had engaged in three courses of his usual regimen of heroin, methamphetamine, and Rohypnol. The expert who testified on his behalf, Dr. MacFarlane, testified that the amount of drugs Martinez claimed to have consumed would have rendered most people unconscious, and could very well have caused an experienced drug addict like Martinez to black out. Dr. MacFarlane described a drug-induced blackout as an "amnesia" in which a person can "carry out certain automatic functions." Dr. MacFarlane made clear that it may "not be obvious" to an

untrained observer of behavior that a person was blacked out. Thus, Martinez was entitled to an instruction on his theory of defense.

■ However, Martinez claims that he was entitled to an instruction which told the jury that a person in a blackout could not, as a matter of law, form the requisite intent to commit the crime charged. There is no basis in law for such an instruction. As we explained in *Echeverry*, the defense of intoxication is merely an element for a jury to consider in determining whether the prosecution has met its burden of proving a defendant's intent. *Id.* Moreover, Dr. MacFarlane conceded on cross-examination that a person who is blacked out might "float into" periods of consciousness in which he "formulate[s] a desire, maybe even a conscious desire, to do something." Thus, there is neither legal nor factual support for Martinez's contention that he was entitled to an instruction that a person who is blacked out is incapable of forming an intent.

Far from failing to adequately instruct regarding the issue of intoxication, the trial court specifically addressed the theory of the defense in its instructions to the jury. Judge Jones explained that the jury "may consider evidence of drug use in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the intent to commit the crime charged." That language was taken directly from Ninth Circuit Model Instruction 6.8.[2] In addition, it bore a striking similarity to the set of instructions this court approved of in *Echeverry*, 759 F.2d at 1454–55 ("Evidence that defendant acted while under the influence of a drug or drugs may be considered by you togeth-

er with all the other evidence in determining whether or not he did in fact have the specific intent to commit each crime with which he is charged.").

■ Martinez correctly argues that he was entitled to an instruction regarding the interplay between intoxication and his ability to formulate a specific criminal intent. Considering the instructions as a whole, a trial court's formulation of jury instructions "is a matter of discretion," as long "as the instructions fairly and adequately cover the issues presented." *Id.* at 1455. Judge Jones explicitly instructed the jury that they were entitled to consider the effect of the defendant's drug use on his capacity to form the requisite intent, and reminded the jury that the prosecution bore the burden of proving beyond all reasonable doubt that the defendant intended to attempt to reenter the United States. Such exacting adherence to the duties of a trial court is commendable; it certainly does not constitute an abuse of discretion.

### C.

■ Martinez next argues that the district court misapplied the Speedy Trial Act of 1974, 18 U.S.C. § 3161 (2004) ("the Act"), by tolling the period between his arrest and his indictment while he was hospitalized for a punctured lung.

The district court's application of the Act is a question of law which we review de novo. *United States v. Nelson*, 137 F.3d 1094, 1108 (9th Cir.1998). The factual findings which underlie that application are reviewed for clear error. *Id.*

---

**2.** Ninth Circuit Model Instruction 6.8 provides:

You may consider evidence of [intoxication] ... in deciding whether the government

has proved beyond a reasonable doubt that the defendant acted with the intent to commit [*crime charged*].

The Act was originally intended to accomplish the dual purposes of "assist[ing] in reducing crime and the danger of recidivism" and "giv[ing] real meaning to [the] Sixth Amendment right" of an accused individual to a speedy trial. H.R. REP. No. 93–1508, at 7402, 7404 (1974). *See also United States v. Scantleberry–Frank*, 158 F.3d 612, 614 (1st Cir.1998) (The Act "is designed 'to protect a defendant's constitutional right to a speedy . . . trial, and to serve the public interest in bringing prompt criminal proceedings.' ") (citation omitted). The Act sets forth precise limitations on the amount of time the government may take to indict, and try, a criminal defendant. Specifically, § 3161(b) requires an indictment to be filed against an arrested individual within thirty days of the arrest date ("pre-indictment period"), while subsection (c) prohibits the time period between indictment and trial from exceeding seventy days ("pretrial period"). Specified amounts of time are excluded from the two calculations: "The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence." *Id.* § 3161(h). Subsection (h) enumerates nine circumstances in which time is to be excluded from the calculation. Martinez contends that the provisions of § 3161(h) do not universally apply to both the pre-indictment and the pretrial periods. His contention is of no avail.

The precise language of § 3161(h) states that the "periods of delay" set forth in (h)(1)-(9) shall be excluded when computing the time elapsed in the pre-indictment period *or* the pretrial period. Martinez contends that the disjunctive language of § 3161(h) makes clear that some of the exclusions listed in (h)(1)-(9) apply to the pre-indictment period, some to the pretrial

period, and others to both periods. In Martinez's view, Congress could have chosen to employ the word "and" to indicate its intent that each of the nine provisions apply both to the pre-indictment and the pretrial periods. While Martinez's argument has the appeal of logic, it has little else working in its favor.

First, if Congress had intended the word "or" to be construed in the manner Martinez suggests, it would have specified which provisions of § 3161(h) apply to the pre-indictment period, and which to the pretrial period. Other than § 3161(h)(3), there is no indication that any of the provisions are singularly applicable to only one of the time periods.

Second, there is a construction in which the choice to use "or" instead of "and" is eminently understandable. Under the current language of the statute, an excludable delay that occurred during the pre-indictment period could be excluded from *either* the pre-indictment period *or* the pretrial period, *but not both.* If the language were reformulated as Martinez suggests, any excludable delays could be excluded from *both* the pre-indictment period *and* the pretrial period, irrespective of when those delays occurred. Such a construction would self-evidently pervert Congress' intent to codify, and therefore preserve the Sixth Amendment right to a speedy trial. *See Scantleberry–Frank*, 158 F.3d at 614. Under Martinez's construction of the statute, a delay which occurred during the pre-indictment period could be used to subsequently exclude otherwise unexcludable delays that occur during the pretrial period. Since a statute must not be construed in a way that produces absurd results, *In re County of Orange*, 262 F.3d 1014, 1018 (9th Cir.2001), Martinez's interpretation of § 3161(h)'s use of the word "or" is inherently implausible.

Martinez argues, however, that the exception set forth in § 3161(h)(3), which allows for the exclusion of time for "[a]ny period of delay resulting from the absence or unavailability of the defendant or an essential witness," applies to an "unavailable" defendant such as Martinez only when his presence "for *trial*" cannot be obtained.

Subsection (h)(3)(A) excludes "[a]ny period of delay resulting from the absence or unavailability of the defendant . . . ." Subsection (h)(3)(B) defines an "unavailable" defendant as one whose "whereabouts are known," but whose "presence for trial cannot be obtained by due diligence. . . ." Martinez makes much of the inclusion of the phrase "for trial." Martinez reads too much into those two words.

A defendant's "presence for trial" may be difficult or impossible to obtain, even at the pre-indictment stage, where an injury precludes him from appearing live in court. The Sixth Circuit reached precisely such a conclusion in *United States v. Nabors*, 901 F.2d 1351 (6th Cir.1990). In *Nabors*, the defendant argued that his rights under the Act had been violated by a thirty-three day delay between arrest and indictment. The Sixth Circuit, however, matter-of-factly excluded six of those days under subsection (h)(3) "because Nabors was hospitalized for leg injuries . . . and was therefore unavailable." *Id.* at 1355.

■ Even if we were inclined to be receptive to Martinez's tortured reading of § 3161(h)(3), the facts of this case severely undermine the efficacy of his argument. Between May 15 (the day after his arrest) and June 6, 2002, Martinez's case was called six times by magistrate judges. Each time, the magistrate judge specifically noted Martinez's inability to appear in the courtroom, and explicitly excluded the time on the basis of Martinez's unavailability. Defense counsel made no objection to the magistrate judges' decisions. In addition, after Martinez was finally released from the hospital on June 6, 2002, defense counsel asked for and obtained a continuance of the preliminary hearing in order to engage in plea negotiations. Though a defendant cannot waive the time requirements set forth by the Act, *United States v. Ramirez–Cortez*, 213 F.3d 1149, 1156 (9th Cir.2000), the inaction of defendant and his attorney suggest that they understood the government to be adhering to the requirements of the Act. Having acquiesced in the entire process, Martinez seeks now to advance a novel theory, premised on a misreading of the statutory language, and withdraw that acquiescence. We decline to endorse that strategy.

Contrary to Martinez's contention, the twenty-two day delay between arrest and indictment which was attributable to his own hospitalization was properly excluded under the auspices of the Speedy Trial Act.

## D.

■ Martinez contends that the government infringed his due process rights by failing to collect and preserve evidence of his intoxication, namely blood and urine samples. The failure to collect and preserve evidence that is potentially exculpatory may violate a defendant's due process rights if that failure was motivated by bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir.1989) ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause.").

■ In order to prevail on this claim, Martinez must first demonstrate that blood and urine samples were material. Evidence is material to a defendant's case if it "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [was] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 488–89, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). There is no question that the evidence might have been exculpatory, since a precise measurement of Martinez's intoxication could have supported his claim that he was so intoxicated that he blacked out. Moreover, the evidence sought was of such a nature that it was not reasonably available to the defendant. Defense expert Dr. MacFarlane testified that blood and urine samples could be collected within 72 hours for accurate drug testing. Defense counsel was not appointed until a full day after Martinez's arrest, and had no indication that a drug test might be integral to his client's case.

■ However, the fact that the evidence *may* have proven exculpatory—it very well may have inculpated Martinez further—does not render it per se "material." In order to meet the definition of materiality, the evidence must have possessed an exculpatory value that was "apparent" before the evidence was "destroyed." *Trombetta*, 467 U.S. at 488–89, 104 S.Ct. 2528. The evidence Martinez alleges was improperly ignored was neither. The testimony at trial indicated that Martinez did not appear intoxicated while he was being detained at the border. During his conversation with Inspector Harrison, Martinez did admit that he had been taking drugs, but did not begin showing any outward indicia of drug intoxication until later that night when he began to suffer from heroin withdrawal. Thus, it was not readily apparent that blood or urine samples might have proven exculpatory.

Moreover, there is no suggestion that the authorities destroyed any evidence whatsoever. Taken in the most favorable light, Martinez's claim boils down to an argument that the government ought to have tested him. A failure to collect potentially useful evidence is distinctly different than a destruction of evidence that is already extant. In this case, the "evidence" Martinez sought was the result of testing of his bodily fluids. Absent such a test, there was no existing evidence for the authorities to destroy. Thus, we are not convinced that Martinez had overcome his preliminary hurdle of demonstrating that blood and urine samples were material to his defense.

Even if we were to find in his favor regarding the materiality of the evidence, however, Martinez has failed to demonstrate bad faith on the part of the government. Martinez was arrested for an immigration violation, which would not normally require blood or urine samples to prosecute or defend. Whether or not Martinez appeared to be intoxicated, the government had no reason to believe that the precise level of intoxication would be relevant to his prosecution. In contrast to the facts of the instant case, in *Miller* this court confronted "an experienced police officer" who interviewed the victim of an attempted rape "less than 24 hours after the attack," was specifically informed of the existence of a blood-stained jacket the victim was wearing during the attack, but nonetheless failed to collect the jacket, then lied repeatedly about why he failed to do so. *Miller*, 868 F.2d at 1121. Here, there is no evidence which, even construed in the most favorable light, would suggest that the officers who detained Martinez acted in bad faith. Martinez was taken to

MCC, treated for heroin withdrawals, removed to API, and finally transported to Alvarado Hospital for treatment of a collapsed lung.

Having failed to demonstrate either the materiality of the evidence or any bad faith on the part of the government, Martinez cannot make out a due process violation based on the failure to collect and/or preserve samples of his blood and urine.

### E.

Martinez argues that the district court erred in allowing the government to impeach his testimony at trial with a sanitized version of his 1996 conviction for possession of marijuana for sale. Evidentiary rulings under Fed.R.Evid. 609 are reviewed under the abuse of discretion standard. *United States v. Jimenez*, 214 F.3d 1095, 1097–98 (9th Cir.2000).

 Under Rule 609(a), evidence of a prior conviction may be admitted for impeachment purposes if the probative value out-weighs the prejudicial effect of admission. In *United States v. Cook*, 608 F.2d 1175, 1185 n. 8 (9th Cir.1979) (en banc), *overruled on other grounds, Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), this court set forth a five-factor test for balancing the relative probativeness and unfair prejudice of a prior conviction. Specifically, we explained that a trial court should consider: (1) the impeachment value of the prior crime; (2) the temporal relationship between the conviction and the defendant's subsequent criminal history; (3) the similarity between the past and the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of the credibility issue. *Id.* While a trial court need not analyze each of the five factors explicitly, "the record should reveal, at a minimum, that the trial judge was aware

of the requirements of Rule 609(a)(1)." *Jimenez*, 214 F.3d at 1098.

In the instant case, the district court acknowledged the *Cook* factors in considering whether to permit the use of the prior conviction. Judge Jones stated that "credibility would be a central issue" in the case, and noted the conviction's "recency." He subsequently reiterated that credibility, specifically the defendant's "character for honesty," "is a factor that will be weighed by the jury in this case," and explained that he would sanitize the conviction by only allowing it to be referred to as "a felony conviction" in order to ameliorate any potential prejudice to the defendant.

 The judge's actions at Martinez's trial were nearly identical to those we endorsed in *Jimenez*. In that case, we felt compelled to infer that the trial judge "reveal[ed] a sufficient awareness of the requirements" even though "he made no specific reference to the five factor inquiry" and did little more than "recognize[ ] the centrality of the credibility issue and the defendant's testimony," while "also attempt[ing] to protect Jimenez to the extent that his assault conviction would unfairly prejudice the jury." *Id.* Under the rationale of *Jimenez*, Judge Jones's recognition of the requirements of Rule 609(a), as set forth by the *Cook* test, was appropriate. We therefore conclude that he did not abuse his discretion in allowing the prior conviction as impeachment of Martinez's testimony.

### F.

 Martinez next shifts his appeal to the post-trial stage, asserting that the district court erred in refusing to grant a downward adjustment in his sentence based on acceptance of responsibility. The district court's findings of fact regarding a defendant's acceptance of responsibility

are reviewed under the clearly erroneous standard, and are entitled to "great deference on review" because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." *United States v. McKittrick,* 142 F.3d 1170, 1178 (9th Cir.1998) (citing U.S.S.G. § 3E1.1 cmt. n. 5).

■■■ Section 3E1.1 of the Sentencing Guidelines provides for a two-level downward adjustment from the statutorily-prescribed sentence when a defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). In determining whether an adjustment is warranted, a court may consider, *inter alia:* (1) whether the defendant "truthfully admit[s] the conduct comprising the offense(s) of conviction," § 3E1.1 cmt. n. 1(a); (2) whether the defendant "voluntar[ily] surrenders to authorities promptly after commission of the offense," § 3E1.1 cmt. n. 1(d); (3) the defendant's "post-rehabilitative efforts (e.g. counseling or drug treatment)," § 3E1.1 cmt. n. 1(g); and (4) "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." § 3E1.1 cmt. n. 1(h). The court should consider the defendant's contrition, *United States v. Ochoa–Gaytan,* 265 F.3d 837, 844 (9th Cir.2001), but "cannot rely upon the fact that a defendant refuses to plead guilty and insists on his right to trial...." *Id.* at 842–43 (quoting *United States v. Mohrbacher,* 182 F.3d 1041, 1052 (9th Cir.1999)).

The parties differ with regard to the permissible inference that may be drawn from Martinez's argument at trial that he lacked the specific intent to commit the crime charged because of his drug intoxication. Martinez relies upon our holding in *Ochoa–Gaytan* for the proposition that "a defendant who contests his factual guilt may, under some circumstances, be enti-

tled to such an adjustment." 265 F.3d at 843 (quoting *Mohrbacher,* 182 F.3d at 1052). The government contests that reading of *Ochoa–Gaytan,* choosing instead to focus on the fact that, in that case, the defendant "made no affirmative defense, called no witnesses, and presented no evidence," but instead directed his efforts on a motion to suppress that was ultimately denied. 265 F.3d at 842 n. 5. In *Ochoa–Gaytan,* we noted that, in this context, "the difference between requiring the government to satisfy its burden and falsely denying criminal conduct is crucial." *Id.*

Martinez argues that the interpretation he advances is supported by our decision in *United States v. Johnson,* 956 F.2d 894 (9th Cir.1992). In *Johnson,* several defendants were each charged with a variety of drug offenses. While not contesting the *actus reus* of their various crimes, the defendants denied criminal responsibility based on the defense of duress. We noted that "[t]he defense of duress is an affirmative defense which negates criminal conduct by the fact of coercion," and that "if the defendants' testimony had been accepted, they would have been not guilty of the crimes with which they were charged." *Id.* at 904. As such, the defendants were "not entitled to a reduction for acceptance of responsibility *during the trial.*" *Id.* (emphasis added). However, because "[t]he Guidelines make clear that the reduction for acceptance of responsibility is available '*without regard* to whether [a] conviction is based upon a guilty plea or a finding of guilt by the court or jury or the practical certainty of trial,'" *Id.* at 904 (quoting U.S.S.G. § 3E1.1(b)) (emphasis added in original), we concluded "that if in fact the defendants accepted responsibility by statements made *after the conviction* they are entitled to [a] reduction." *Id.* at 905 (emphasis added).

Alas, our decision in *Johnson* is of no avail to Martinez in this case. *Johnson* was decided prior to the amendments made to the Sentencing Guidelines in 1992, in which the precise language we relied upon was deleted from § 3E1.1(b). Moreover, our decision in *Johnson* is directly at odds with the amended Commentary to § 3E1.1. Specifically, as currently constituted, note 2 provides: "In *rare situations* a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial.... In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon *pre-trial statements and conduct.*" U.S.S.G. § 3E1.1 cmt. n. 2 (emphasis added). Martinez's purported acceptance of responsibility for his crimes, which occurred during the sentencing phase of trial following his conviction, may not properly form the basis for a downward adjustment under § 3E1.1.

 Moreover, while Martinez insists that the district court based its decision on the impermissible consideration of his decision to exercise his right to trial, there is no support in the record for such a claim. The district court explicitly stated that it considered the briefs submitted by the defense and the government, among other pertinent documents. The court indicated that it was "mindful of the testimony of Mr. Martinez at trial," and "the statement made subsequent to his arrest." With those factors in mind, the court indicated that it was "satisfied that the acceptance is inappropriate." Under the deferential standard of review appropriate to this situation, that decision is virtually unassailable. Martinez refused to talk to the probation officer charged with preparing the Pre Sentence Report. At sentencing, he stated that he was "sorry for the mistakes" he had made, but laid the blame for his decisions on his drug addiction. Instead of expressing contrition or remorse, he described the living situation in Mexico to which he wished to return. As a statement of accepting responsibility, Martinez's apology was at best ambivalent. Therefore, the district court did not clearly err in refusing to grant a downward adjustment under § 3E1.1.

### G.

Finally, Martinez argues that the cumulative effect of the errors committed at his trial justifies reversal of his conviction. In cases where "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir.1996). However, the "cumulative error" analysis is inapposite to this case. Defendant has failed to demonstrate any erroneous decisions by the trial court.

### III.

Martinez has raised a litany of issues in this appeal, imploring this court to either vacate his conviction, or remand to the district court for re-sentencing. Unfortunately for Mr. Martinez, his trial was handled ably by District Court Judge Jones. As we are unable to identify any erroneous decisions made either before, during, or after Martinez's trial, we hereby AFFIRM the proceedings below in their entirety.

**AFFIRMED.**